B. M. MEARES ET AL. v. WYNNEWOOD LUMBER COMPANY.

(Filed 18 October, 1916.)

**1. Railroads—Fires—Foul Right of Way—Negligence.**

The skillful and careful running of a properly equipped locomotive by the employees of a railroad company does not relieve the company from liability for damages caused to the owner of the lands by its negligence in permitting its right of way to be in a foul condition, covered by inflammable matters which was ignited by the dropping of sparks from the engine.

**2. Same—Trials—Evidence—Proximate Cause—Questions for Jury.**

Evidence is held sufficient to be submitted to the jury upon the issue of the defendant railroad company's actionable negligence in setting fire to the plaintiff's land, and upon the question of the proximate cause of the injury, which tends to show that the fire broke out upon the defendant's foul right of way, which had not been previously burnt off and was covered with pine straw and other inflammable matter, before the locomotive had passed from sight; that it had previously on several occasions been observed to throw quantities of sparks from its smokestack, and that the fire spread to the lands of the plaintiff, an adjoining owner, and damaged the growth thereon.

**3. Railroads—Fires—Evidence—Appeal and Error—Objections and Exceptions—Questions and Answers.**

A question, material to the controversy, asked a witness, whether he saw sparks from defendant railroad company's locomotive fall upon its

right of way, ignite the matter thereon, and spread to adjoining lands, is not objectionable, and where the answer is not objected to, it will not be considered on appeal, though erroneous. In this case the answer is held competent as tending to show that the locomotive was defective in emitting sparks.

**4. Evidence—Impeaching—Substantive—Trials.**

     Questions and answers of the defendant railroad company's witness in this case, asked on cross-examination, for the purpose of impeaching his testimony in the defendant's behalf, and showing his bias, are held competent for those purposes, though incompetent as substantive evidence.

CIVIL ACTION tried before *Daniels, J.,* and a jury, at April Term, 1916, of BLADEN.

. Plaintiff alleged that defendant, which operated a tramroad on its premises in 1914, on which was run an engine and log trucks, had negligently permitted sparks or live coals to escape from the engine, so that the stubble and other combustible material lying by the side of the railroad track caught fire, which spread and burned a large part of his timber near by. Defendant denied the allegations and insisted that there was no evidence of negligence. It will be necessary, therefore, to state some of the testimony.

W. C. Burney testified: "Fire got out on this land in March. I was working with Wynnewood Lumber Company in the log woods. They have a tramroad on the Meares land. Where the track was laid there was nothing but logs and stumps, and things were cleaned and some of it might have been burned off, but I don't remember. If it was, I have forgotten. The track was laid right on the grass. I disremember whether any of that portion of the Meares land was burnt over. I was working out there in the woods when the fire started. Did not see fire when it first started. Had been burning a short while. The tram engine had pulled out with the loading machine, and had no more than got out of sight when the fire got up about 50 yards from the machine on the track. I was at loading machine. Fire caught 4 or 5 or may be 6 feet from track. I didn't measure it. Right of way there where the fire got out had not been burned off. Didn't go where fire was. Didn't see anybody go. It burned off from track; I don't know how far. It was on Meares' land. It burned off from track, and all the woods was on fire where I was at work. Tram engine was at the loader, where I worked, two or three times a day. Don't know whether it was equipped with spark arrester or not. I have seen it sending out sparks. I noticed it sending out sparks any time I saw the engine. I did not go where fire originated at all—not that day. Don't know where fire originated. It had got up side the road after the train had passed.

Train had been gone just a short while, was not out of sight; it was about 300 yards down the track—something like that. Was at the machine when the train left. Don't know where fire was when train left. Don't know who put the fire out."

S. M. Black testified: "I was going in on a load of logs when fire got out. Remember when fire burnt the land of Mr. Meares in March, 1914. There was dead grass, pine straw, and bushes on right of way. Noticed fire as I drove up on the bed, down the road about 50 yards. I was hauling logs to railroad. Fire was about 6 feet of track of defendant when I saw it. The engine had just left there. It was not more than 300 or 400 yards down the road when fire sprang up."

Q. "What do you know about whether the engine was equipped with a spark arrester?" A. "It was throwing sparks all the time. I was not there that day. Fire burned towards Mr. Meares' house. It burned all day towards his house until we left. I worked on Meares' land after that time. Six hundred or seven hundred acres were burnt. It was pretty dry time. It was a pretty good fire—I mean a big, heavy fire—and it burned over the land and the undergrowth and things like that. After fire there was not much undergrowth and small trees. There was a number of people there. Don't know who set the fire out; don't pretend to say. Plenty of people were in the woods working around that particular locality. There were a lot of negroes there. Didn't see them smoking. They were not around me. Don't know whether they were smoking. There was no other fire in that particular locality that day. This was latter part of March, 1914; don't recollect date. That was all the fire there right then. There were other fires after that. They were cutting Meares' timber; had been at it something over a month. Don't know how fire originated or where it started. Did not see any smoke before engine passed. Fire occurred also in May in my woods and my father's. They kept the train on the tram by my place pretty near my house. The train went out one day and strung fire as it went out. I was looking at it and had to secure the fence, and it burned right on to the house. No one came but myself. It burnt all back towards my brother's house, when he was living on my place, towards the swamp. It burned, I suppose, 175 or 200 acres; it burned over that. I didn't go over to it that day or around it, as I had to secure the fence and buildings. Altogether, with the fires that occurred in between and the March and May fires, it burned about 700 acres, including all the fires. The tram kept putting out fires. I never saw the train but twice when it was setting out fire from the train blowing out some sparks; but there were others along the line where they were at work, and I saw it twice to my own knowledge.

Condition of right of way was rough. I mean undergrowth, grass, straw, and such. They burned the right of way on what they called the main line. After that there was no more right of way burned only as the train fired the woods, that I saw. I saw that much burned, about a quarter to half a mile. Where fire was put out in May, 1915, on right of way there was straw and leaves. It was not burned. It was left with fine litter on top of the ground, and it sprung out towards my place from both ways. It burned from the track on both sides. Don't know whether engine was equipped with a spark arrester. If they did, they had it on the inside of the smokestack where I could not see it. I saw the engine and rode it, too, and it was blowing out sparks. I saw the fire and sparks from the smokestack as it pulled out on day of the fire. I was not at the railroad. I saw it from the yard. It had been firing the woods, and it had not been burnt in there. It burned lots of lightwood, and killed lots of undergrowth and small timber and such like, to a great extent, and litter and straw. It burned it clean as it went, for it was dry, and where the woods were rough it killed the majority of the small timber. I don't know if fire went out at all from March until May. I didn't stay to see if it all went out. There were different fires between March and May."

W. J. Long testified: "I know where the Meares land is. I was working about 200 yards of the tramroad and cutting cross-ties on the Meares land, and I heard a roaring about ten minutes after the train passed and saw smoke, and I went as quick as I could and tried to put it out, and could not. It was in tree-tops and the wind was blowing heavy and the tree-tops were right by the side of the track, not even 10 feet. Tree-tops were dead. They had been cut two or three months. That fire burned a portion of Meares land. Have been over a portion of Meares land since it was burned; have been over 200 or 300 acres, I suppose. The land was burned clean. I know where fire started. Don't know how it started. It sprung up in ten minutes after train passed."

B. M. Meares, Jr., testified: "I was living on the property at time of fire in March, 1914; also May, 1914, and between those times. About 700 acres were burned over altogether. About 1,100 acres in whole tract. It burned everything off of it and killed the young timber and killed some timber which was 10 inches and killed lot of it. It left it clean. You could see the dirt. In March I reckon the fire burned over 500 acres. In May about 200 acres were burned. I know about them putting out a fire once after the May fire. I saw the March and May fires. Don't know anything about fire between March and May. Right of way was rough. They did not clean anything but the trees.

They left straw and grass there, and in some places the straw was 6 inches deep or more. Sometimes I would see the engine every day for a week and two or three times a day. Don't know whether it had a spark arrester."

Q. "State whether or not when the engine was in operation on the track across your father's land it emitted any sparks or fire, and, if so, to what extent?" A. "I saw it put out fire one day. I was looking at it, but they had the fireman on the loader throw a bucket of water on it. One afternoon they had him to watch it. Fire came from bottom of it. Started between the tracks. That was strip of woods that had not been burned, and they would keep the fire put out until they got where it had burned."

The jury returned the following verdict:

1. Are the plaintiffs the owners of the land described in the complaint? Answer: "Yes."

2. Did the defendant negligently set fire to and burn the lands of the plaintiffs, as alleged in the complaint? Answer: "Yes."

3. What damages, if any, are the plaintiffs entitled to recover of the defendant? Answer: "$250."

Judgment was entered thereon, and defendant appealed.

*Bayard Clark for plaintiffs.*
*Herbert McClammy for defendants.*

WALKER, J., after stating the case: There was ample evidence in this case to the effect that the defendant's engine was improperly or defectively constructed with reference to its smokestack and fire box; that it was carelessly operated, and, lastly, that its right of way was very foul, being rank with combustible material; and also evidence that fire was set out by the engine which proximately caused the destruction and loss of plaintiff's timber. It is not necessary that the origin of the fire should be established by positive or direct testimony; that, for instance, of an eye-witness, who testifies that he was present and saw how it originated; but it may be shown by circumstantial proof, like any other material fact in issue. *McRainey v. R. R.,* 160 N. C., 570; *Thompson v. R. R.,* 72 W. Va., 555. This case, in every phase of it, except the questions of evidence, which we will notice later, falls within the principle as stated in *Knott v. R. R.,* 142 N. C., 238; *Williams v. R. R.,* 140 N. C., 623; *Whitehurst v. R. R.,* 146 N. C., 591; *Cox v. R. R.,* 149 N. C., 118; *Currie v. R. R.,* 156 N. C., 419; *Aman v. Lumber Co.,* 160 N. C., 360; and there are others of the same kind. In *Aman's case, supra,* we adopted the analysis of the law made in the *Williams case, supra,* as follows:

"1. If fire escapes from an engine in proper condition, having a proper spark arrester and operated in a careful way by a skillful and competent engineer, and the fire catches off the right of way, the defendant is not liable, for there is no negligence.

"2. If fire escapes from an engine in proper condition, with a proper spark arrester, and operated in a careful way by a skillful and competent engineer, but the fire catches on the right of way, which is in a foul and dangerous condition, and thence spreads to the plaintiff's premises, the defendant is liable. *Moore v. R. R.*, 124 N. C., 341; *Phillips v. R. R.*, 138 N. C., 12.

"3. If fire escapes from a defective engine, or defective spark arrester, or from a good engine not operated in a careful way or not by a skillful engineer, whether the fire catches off or on the right of way, and causes damage, the defendant is liable. *Williams v. R. R.*, 140 N. C., 623."

A railway company may be supplied with the best engines and the most approved apparatus for preventing the emission of sparks, and operated by the most skillful engineers. It may do all that skill and science can suggest in the management of its locomotives, and still it may be guilty of gross negligence in allowing the accumulation of dangerous combustible matter along its track, easily to be ignited by its furnaces, and thence communicated to the property of adjacent proprietors. Conceding that a railroad company is relieved of all responsibility for fires unavoidably caused by its locomotives, it does not follow that it is exempt from liability for such as are the result of its negligence or mismanagement. The removal of inflammable matter from the line of the railroad track is quite as much a means of preventing fire from spreading to adjoining lands as the employment of the most improved and best constructed machinery. *Knott v. R. R., supra; R. R. v. Medley,* 75 Va., 499. This statement of the law was taken from *Medley's case* and adopted by us in *Knott's case.*

The witness W. C. Burney testified that the fire broke out just after the train had passed, or, to use his expression, "the train-engine was no more than out of sight when the fire got out about 50 yards from the machine on the track." W. B. Hobbs, who was working about 200 yards away, testified that he heard a roaring about ten minutes after the train passed and saw the smoke; that he went to where the fire was, and found it in dead tree-tops. "which were right by the side of the track—not over 10 feet distant." B. M. Meares, Jr., testified that "he had seen it put out fire one day, was looking at it, when they had the fireman on the loader throw a bucket of water on it, and watch it. Fire came from the bottom of it, and started between the tracks. This was

where there was a strip of woods that had not been burned, and they would keep the fire extinguished until they got to the place where it had been burned off."

This evidence alone made the question of negligence one for the jury, and makes out a much stronger case of negligence than did the proof in *Deppe v. R. R.,* 152 N. C., 79, or *McRainey v. R. R., supra,* which cites *Hardy v. R. R.,* 160 N. C., 116; *Henderson v. R. R.,* 159 N. C., 583; *Fitzgerald v. R. R.,* 141 N. C., 535, upon the sufficiency of circumstantial evidence to prove the fact of negligence in dropping live coals or cinders from the defendant's passing train. It appeared in that case that the train had passed by the place, where the burning occurred, more than two hours before the fire was discovered. When the witness spoke of the roaring which he heard at a distance ten minutes after the train had passed, and which came from the direction where he afterwards saw the fire, he evidently referred to the "roaring" noise which so large a fire makes when driven by a high wind.

Upon a motion of this kind we must view the evidence in the light most favorable to the plaintiff, and, thus considered, we are of the opinion that it was sufficient to warrant the jury in drawing from it an inference of negligence. *Armfield v. R. R.,* 162 N. C., 24.

The objections to testimony were not well taken. As to the evidence of B. M. Meares, Jr., the objection should have been to the answer, for the question was unobjectionable in form, as the witness could state whether he saw sparks coming from the engine. But we think the answer was also competent. If the engine, by emitting sparks, had caused a fire, it tended to show, not so much that it kindled this particular fire, as that it was in some way defective. *Knott v. R. R., supra; Whitehurst v. R. R., supra.*

The case of *Cheek v. Lumber Co.,* 134 N. C., 225, and *Ice Co. v. R. R.,* 126 N. C., 797, do not militate against this position. The latter case rather tends to sustain it. It comes within the rules adopted there as regulating the admissibility of such evidence, and taken from the opinion of the Court in *Henderson v. R. R.,* 144 Pa. St., 461. The engine was fully identified in this case, and it would seem from the evidence that there was but one on this logging road.

The questions asked the defendant's witnesses to which exceptions were taken were intended to impeach them and to discredit their statements as to the nonliability of the defendant for burning the plaintiff's woods. As such, they were competent. Many questions, and answers which are incompetent as substantive testimony, may, nevertheless, be admissible for the purpose of contradicting or impeaching a witness, and sometimes are very relevant for that purpose, or to show the bias

of the witness, and that his testimony has been warped by it. Lockhart on Evidence, sec. 280.

There is no error in the case disclosed by the record.